# IN THE COURT OF APPEALS OF IOWA

No. 24-0513
Filed May 7, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CHRISTOPHER EUGENE PRICHARD,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Jackson County, Mark R. Lawson, Judge.

        A defendant challenges his conviction of first-degree murder.  **AFFIRMED.**

        Kent A. Simmons, Bettendorf, for appellant.

        Brenna Bird, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

        Considered without oral argument by Ahlers, P.J., Buller, J., and Bower, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**BOWER, Senior Judge.**

Christopher Prichard appeals his conviction of first-degree murder for the shooting of his estranged wife. He challenges the district court's decision to allow evidence of his wife's fear of him and the temporary no-contact order between them. Upon our review, we affirm.

## I.        Background Facts and Proceedings

Prichard and Angela had been married for a few years when their relationship began to deteriorate in 2022. On August 29, Angela moved to her sister Wendy's house because she "started to be more scared of [Prichard]." On September 2, the district court granted Angela a temporary no-contact order against Prichard. Angela detailed her fear of Prichard on sticky notes she kept in a notebook: "I think Chris is capable of anything, He told my sister he didn't care if he went to jail—He put guns all over upstairs in 3 different rooms"; "I don't feel safe anywhere anymore. My sister's, my House, my son's, stores in town. Went to my sister's this morning around 10:00—said he didn't give a fuck if he goes to jail"; "Scared of him, He says nasty & mean, cruel things to me—He has harassed & threatened me"; "Always looking over my shoulder, see if he's around—Scared of him and what he's capable of."

On October 7, Prichard parked his truck in a pole barn at Michael and Lori Blaser's farm. Prichard had previously done some electrical work for the Blasers, but they had not planned on him coming over that day for additional work. Prichard left a note on his truck stating,

> Hey Mike,
> Came out to take these lights down. I just had seven c[o]yote
> cross the road in front of me about a mile up the road. I'm gonna go

try to kill a couple of them. Keys are in the truck i[f] you need to move
it. I'll be back.
                    Chris

Prichard's truck was still in the barn the next morning. And the Blasers noticed the bed and toilet in the horse trailer they stored in the barn had been used.

Angela arrived to work at Mississippi Ridge Boarding Kennels 7:34 a.m. on October 8. About five minutes later, she called 911. With the 911 dispatcher on the line, Angela spoke to someone else, "Please . . . . I have customers coming in, can you please get out of here?" followed by, "Chris!" and a gunshot. A few seconds later, a male voice can be heard faintly saying, "Fuck you" as dogs barked in the background.[1]

Responding officers found Angela's body face down on the floor in an employee room of the kennel building. An associate state medical examiner determined Angela died from a gunshot wound to the center of her chest. He stated she would have died almost immediately. The shot came from a 20-gauge, single-shot shotgun. A firearms examiner testified there are "multiple steps" to take for this type of shotgun to fire—you have to load the gun, then "you have to physically cock the hammer to the rear. And then you pull the trigger."

Prichard took off on foot from the kennel, escaping into the woods with Angela's purse. He evaded police during their search for him throughout the day. At around 8:30 p.m., Prichard showed up at his friend Jeffrey Junk's house. He was still carrying the shotgun, which he handed to Junk. Prichard was "wet and cut up" from "trying to lose the dogs that were chasing him." He asked for a beer,

---

[1] Dogs had also barked in surveillance camera footage approximately three hours earlier, when Prichard entered the kennel to wait for Angela to arrive to work.

a cigarette, and food. Prichard said he shot Angela "in the arm" but stated if she was dead then he was "going to jail for a long time." He didn't express surprise or remorse about the fact Angela had died. Prichard drank and talked for a few hours before he passed out on Junk's recliner. Junk then contacted police, who came to his home and arrested Prichard.

Prichard was belligerent and told the officers to kill him. On the way to jail, he asked police to stop the vehicle and execute him. Thereafter, he told police he went to the kennels to talk to Angela "to make things better," but she shoved him and the gun went off, and then Angela yelled at him to leave. He stated Angela had threatened to take all his money so he took her purse. In another interview, Prichard said he went to the kennels to steal money from Angela because Angela "wanted to drag [him] through the mud and make [him] a monster." In his third interview, Prichard said he took the shotgun and shells from a hunting cabin at a nearby campground.[2]

The State charged Prichard with first-degree murder and first-degree robbery. Before trial, the defense moved to exclude "[a]ny reference to prior arrests, convictions, completed deferred judgments, or bad acts" by Prichard, "includ[ing] the [no-contact order] which the State alleges was violated by [Prichard]." The defense also moved to exclude "[h]earsay from any party." The State filed a motion noting its intent to offer evidence of "[p]rior bad acts directed at the victim, Angela Prichard perpetrated by Defendant, including but not limited to prior domestic abuse assault, no contact order, violations of the no contact

---

[2] Clifford Wienschenk, an acquaintance of Prichard, corroborated his 20 gauge, single-shot shotgun had been taken from his hunting cabin.

order, and the victim's own words and writings expressing fear of Defendant in the weeks leading up to her death." At the outset of trial, the State presented testimony from Wendy in an offer of proof to support the admission of such evidence. The district court ruled as follows:

> Well, by [Wendy's] testimony, the statements [by Angela expressing fear of Prichard] were made somewhere between or shortly before August 29th and up to somewhere just short of October 7th. That's the time frame, apparently, they were made. I do believe they are a statement of her state of mind. And, therefore, they meet an exception to the hearsay rule.
>
> I also find that they're relevant. I think the prior relationship between—the case law is pretty clear that the prior relationship between the victim and the defendant is relevant in the—in a case of this nature. I would refer to [*State v. Taylor*, 689 N.W.2d 116 (Iowa 2004),] where that's discussed in some detail.
>
> So the Court finds that [Wendy's] testimony concerning those statements, at least as I heard them here, would meet an exception to the hearsay rule, is relevant to the issue of the prior relationship between the parties, and Ms. Prichard's conduct in living with her sister while she was doing that. And the Court finds that the relevance of that is not substantially outweighed by the danger of unfair prejudice. So that will deal with that issue.

The court further found evidence of the temporary no-contact order was admissible "on a proper foundation"[3] but evidence of the permanent no-contact

---

[3] The court ruled, in relevant part:

> I don't think a temporary no contact order is the kind of thing that's going to enflame the passions of a jury. It's simply a temporary document. A permanent one, that might concern me a little more. But this is a temporary order, and I'm sure the circumstances of that will be explained by one party or the other. It is relevant to the issues of malice, intent, and motive, as I said.
>
> So although there may be some small danger of unfair prejudice by the entry or the admission of the temporary no contact order, I do not believe that that would substantially outweigh its relevance on the issues of malice, intent, and motive. So for those reasons, the Court's ruling will be that the temporary no contact order is admissible on a proper foundation.

order issued on October 7 was not admissible because Prichard didn't appear for the hearing and "[t]here's no evidence [he] was aware" of the order.

After hearing four days of testimony, the jury found Prichard guilty as charged. The court sentenced him to life in prison without the possibility of parole for the murder conviction and a concurrent twenty-five-year term for the robbery conviction. Prichard appeals.

## II. Standard of Review

We review hearsay challenges to correct errors at law. *State v. Skahill*, 966 N.W.2d 1, 8 (Iowa 2021). Hearsay is generally inadmissible, but it may be admitted if the out-of-court statement fits within an exception to the hearsay rule. *State v. Veverka*, 938 N.W.2d 197, 199 (Iowa 2020). We review evidentiary rulings relating to the admission of prior bad acts for abuse of discretion. *Powers v. State*, 911 N.W.2d 774, 780 (Iowa 2018). "An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001) (citation omitted).

## III. Analysis

Prichard challenges the district court's admission of Wendy's testimony relating to Angela's statements expressing "her fear of [Prichard]" and "the fact that she obtained the [no-contact order]."[4] Prichard also takes issue with Wendy's testimony about notes Angela had written expressing her fear of Prichard.

---

[4] The State argues Prichard may have failed to preserve error on these specific claims on appeal because his motion in limine was "broad" and his arguments were "vague." We assume without deciding the claims were adequately preserved.

Prichard maintains "[t]he State cannot carry its burden to affirmatively show the inadmissible hearsay was not prejudicial." In response, the State argues the district court properly allowed evidence of Angela's fear of Prichard.

The State further claims the admission of Wendy's statements, even if improper, was harmless error. "We can start and stop our analysis with this alternative." *State v. Buford*, No. 23-1296, 2025 WL 716485, at *3 (Iowa Ct. App. Mar. 5, 2025). Preliminarily, as the State accurately points out, Angela's harrowing 911 call "is so compelling that it alone nearly provides all the evidence necessary to convict [Prichard] of first-degree murder." In any event, the State presented overwhelming evidence of Prichard's guilt. *See State v. Parker*, 747 N.W.2d 196, 210 (Iowa 2008) (relying on the existence of overwhelming evidence in finding harmless error); *see also State v. Cox*, 781 N.W.2d 757, 771 (Iowa 2010) (considering "whether the error was harmless" as part of prior-bad-acts-evidence analysis).

After Angela moved out, Prichard stalked her for weeks. Wendy observed Prichard's obsessive behavior and reflected, "I tried not to let her out of my sight." In the days leading to the murder, Prichard meticulously planned his attack on Angela. Despite owning multiple firearms of his own, he took a shotgun from an uninhabited cabin (later reflecting its owner likely still didn't know the gun was gone), created an extensive alibi, and hid in a barn and the woods until he entered the kennel hours before Angela was to arrive at work. After the shooting, Prichard took Angela's purse, escaped into the woods, and evaded police for the whole day (later recalling the "boys" did a good job trying to find him). *See State v. Wilson*, 878 N.W.2d 203, 211 (Iowa 2016) ("It is well-settled law that the act of avoiding

law enforcement after a crime has been committed may constitute circumstantial evidence of consciousness of guilt that is probative of guilt itself."). When he learned Angela was dead, he showed no remorse and acknowledged he was going to jail. Prichard admitted the shotgun he brought to Junk's home was the murder weapon. Finally, Angela's handwritten notes about Prichard were admitted into evidence, without objection by the defense. Those notes, quoted above, detailed Angela's fear of Prichard and "what he is capable of"—in her own words.

Under these facts and circumstances, "the strength of the State's case renders harmless any possibly erroneous admission of hearsay." *Buford*, 2025 WL 716485, at *4. In other words, because the evidence against Prichard was overwhelming, his conviction did not turn on evidence of Angela's fear of him. *See id.* ("We will not reverse a conviction if the State can prove the challenged evidence did not affect the jury's verdict.). Prichard is not entitled to a new trial. We affirm his convictions.

**AFFIRMED.**